David Harsha, the Federal Defender, I represent Appellant Penny Sanchez and I will be presenting the entire argument and will try to reserve five minutes. Sanchez appealed for denial of multiple habeas claims challenging his two first-degree murder convictions and death sentence for aiding and abetting Joey Bocanegra who stabbed his parents Juan and Juanita Bocanegra to death. Sanchez's guilt-based claim of ineffective assistance of counsel for failing to investigate and present Robert Reyes's admission to trial series must be assessed in light of the prosecution's evidence against him at trial and all the available but unprevented evidence for his defense. The prosecution's case was far from overwhelming. It rested on three pieces of evidence. Can I ask you a question? Right, you said about Reyes. Now my understanding is Reyes inducted Fifth Amendment right against self-incrimination. So how could counsel have found a way to admit his statement? Well he would have they would have been admitted because Charles Feeley would have testified to his admissions and they would have been statements against interest. So that's your theory on that you don't see any I mean obviously some of them there's kind of it's tricky here because I'm guessing that Joey Bocanegra skated on this because of the Sanchez and Reyes both invoked their Fifth Amendment rights and then it got tricky as to the statements that the I guess not I don't know I don't I probably should not nice to call people snitchers but whatever the people that were the jailhouse I guess jailhouse informants I guess would be the that them took statements from Sanchez right so they're testifying as to what Sanchez says so if they're testifying as to what someone else does then it gets tricky because there can't be any cross-examination of Reyes. That is correct but the state has never argued throughout the history of this case that Reyes's admissions was not admissible. Is there a microphone please I'm having trouble hearing you. Yes but I what I was trying to say was that throughout the history of this case the state has never argued that Reyes's admissions would not have been admissible under the statement against interest exceptions of the hearsay rule and just telling you correct that both Sanchez and Reyes made statements to jailhouse informants and that was going to be the basis of the prosecution against each of them. In this case jailhouse informant Hernandez was the only witness to testify to Sanchez's actions during the Bocanegra crimes and the prosecutor bolstered his uncertain reliability with two corroborative witnesses. The prosecutor called the court. Wait a second just just so I can keep all the witnesses straight because we've had the first it's sort of an unusual procedural way that we see things here because the first part was a combination of the preliminary hearing transcripts and what witnesses testified in the guilt phase. The two officers. The prosecutor as I recall called seven witnesses. She called some law enforcement witnesses to testify about screwdrivers that were found on Sanchez when he was arrested for a burglary. They called the clerk from the Bakersfield Inn. This is on the Chapman non-capital. Right. About receipts and property that had been found in Mr. Sanchez's room and also to testify about the amount of money that Woodrow Wilson, Chapman's victim had in his room. Police officers also introduced Sanchez's statement. That was at the Bocanegra. The most important evidence that the prosecutor introduced as her official evidence was reporter Trahi and she was very clear in her argument to the judge and in her closing argument that she was concerned that the judge may not believe testified that Sanchez in one of his five interviews with the reporter had said he was a triple murder. She used that as a complete confession or admission to his guilt on the Bocanegra. Now, one of the things that counsel Toten did not do is that he was given the opportunity to cross examine reporter Trahi on all his published articles and as we say in our uncertified claim on this, Trahi cross examined just someone he published about what Sanchez said would have been able to explain that Sanchez was not admitting he was a triple murder. He was expressing incredible remorse for not stopping Joey and killing his parents. The second bolstering witness that the prosecution called was criminalist Gregory and what he testified to was that there were only two sets of non-victim shoe prints in the Bocanegra's kitchen and hallway and this was essential for the prosecution's theory because the theory in prosecuting Sanchez was that it was a two-assailant crime and her whole case against Sanchez rests on Hernandez saying that Sanchez hit Juan, Mr. Bocanegra, and that because he said he hit Juan, he must have intended to kill him and he also must have hit Juanita and intended to kill her because there was no one else in the house. Well, Mr. Bocanegra kept lying as he himself admitted after Sanchez's trial was false. He came out with a supplemental report that oops, there actually were three sets of non-victim shoe prints. Talk now. Counsel, Judge Gould, if I could interject a question. Could you please elaborate as to why in your view the prosecution's case totally rested on there being only two persons involved in the murders as opposed to three? Yes, and I think that easiest way to do that is to look at Reyes's admission. So, if Reyes's admission had been used in Sanchez's offense, what we would have had is Reyes said to Charles Healy that he won with the bar and that at that time Sanchez was in the hallway. Reyes's admissions would have shown that Sanchez played no role whatsoever in the attack on Juan. And then because the prosecution in her two-thirds personally case depended on Sanchez's actions against Juan to prove his guilt against Juanita, we would have a completely different situation. What we have with regards to Juanita's murder under the Reyes's admission are that we would have, that counsel would have had the basis for arguing that his actions with regard to Juanita did not show an intensity of guilt. That what you have is him trying to move Mrs. Bruckenegger away from Joey. Reyes testified... I think there's some conflicting evidence on that point though about, I can't recall if it was the fabric that was choking as well and that the autopsy doctor said that it couldn't say for sure that she was choked, but that there was injuries to the neck that would be consistent with choking. Isn't that part of the evidence too? It's not, that is not a complete statement of the evidence. There was evidence that there was a piece of cloth tied loosely around Mrs. Bruckenegger's neck, but the prosecutor admitted at trial in her closing argument that it was a gag, that there was no evidence that it was used as a ligature or to strangle. So that she herself said that it was an attempt to gag. So what we have is evidence that there's an attempt to tie up Mrs. Bruckenegger and attempt to gag her. And under Reyes's admission, counsel would have been able to present a counter narrative to the prosecution's case, which would have shown that Sanchez's actions in trying to restrain Mrs. Bruckenegger and then help Reyes move her to the back room away from Joey, trying to tie her up and quiet her, and then in an attempt to quiet her, hitting her on the head, all happened before Joey entered the room. If Sanchez intended that step out of the way in the hallway, why would he have tried to push Mrs. Bruckenegger, who weighed 299 pounds, to the back of the bedroom? Why would he try to tie her up and quiet her if his intent was to kill? And so- Ms. Rifkin, if I could interject, let's assume his intent was not to kill but his intent was to restrain Juanita so she didn't interrupt the murder of Juan. Wouldn't that be aiding and abetting? Aiding and abetting on the- Juan Juan's murder. Well, it's interesting that no one in the 25 years of the litigation of this case has suggested that theory, but I think it was only the evidence of an- of aiding and abetting Juan if it was proved that his intent in restraining Juan, Juanita, was to aid and abet Joey in his attack on his father. And I think that when you have the counter evidence by Reyes's admissions, you have a fair inference that it was not to aid and abet Joey, that his attempt to restrain Juanita was not done for the purposes of aiding and abetting Joey. I think it's ambiguous. Judge Baird, wasn't there evidence that Sanchez, when he was handling- we won't say what he was handling Juanita, was shouting out to Reyes to shut her up, that Juanita was very vocal about what was happening to Juan Bocanegra and wanted to prevent his being killed? And then at that point, Reyes said, with the heroin- daily heroin habit, what- and excuse me, that is what Hernandez testified to. Reyes countered that and said it was Joey, Joey told his mother to shut up, that Reyes and Sanchez were pushing Juanita to the back bedroom, they were trying to stay her- keep her away from Joey, and then Joey comes into the room with a knife and tells his mother to shut up and starts to stab her. Following up on Judge Gould's comment, isn't the fact that Sanchez restrained Juanita from going into the kitchen evidence that he aided and abetted the killing of Juan? No, I think it's- it's discussable. It's just a different inference, one that is consistent with- Well, but that's not the- that's not the way you answer it, isn't it? That, I mean, we have to find inferences in favor of the finder effect. So, one inference is that he was aiding and abetting. That's not the inference you want us to draw, but I'm- isn't that one inference? At the point that under Reyes's- Reyes's statements, which were more detailed, more coherent, more consistent with the physical evidence, that Juan had already been killed. He had already- he might not have been dead, but he had already slumped to the floor when- when Sanchez was struggling with Juanita. And it's not clear that- that the intent was that if he wanted Juanita to be killed, he should have just let her run to Joey, and it's sad that just- that evidence supports a finding of- of not having an intent to kill. Now, there was a year between the guilt phase and the penalty phase, right? Not a year. So, there- oh, well, there was- the preliminary hearing happened over a number of- and then, yes, the actual guilt phase happened in July of the 88th, and then the penalty phase. So, in terms of the- Yeah, there was kind of- so, I have a question about at the- all right, the- the three footprints, when did that come out? Was that- did that come out at the penalty phase, or was that after the penalty? Oh, that was after Reyes was- was- I mean, excuse me. That happened after Sanchez was sentenced to death, and the prosecutor, same prosecutor, proceeded against Reyes. She proceeded on the same two-person theory against Reyes. Reyes was- Didn't Reyes- didn't Reyes- I thought Reyes got a deal on a plea for life without. Yes, after- after- after criminal scouting came up with a third set of footprints, then there was a plea bargain, and Reyes got parolable life sentences. All right, so- but he didn't go to trial on the- he didn't go to trial, did he? No, he ended up negotiating a plea agreement. All right, so, let's- if- when we get to the penalty phase, who were the witnesses- tell me who the witnesses were at the penalty phase. How did the prosecutor- since a jury was hearing the penalty phase, and a judge heard the guilt phase, how did the jur- what were the witnesses that the prosecutor called, and what were the witnesses that the defense called in- at the penalty phase? With regard to the Bocanegra murders and the non-capital Tappan murder, the prosecutor approached it like a penalty retrial. She said she would when- when they agreed to this. She said she was going to approach the penalty phase, but as if it was a retrial, she put on her whole case. She put on- Well, but that- that makes sense, because she was arguing that those were the aggravating factors, right? I'm saying it doesn't make sense. What I'm saying is that trial- that defense counsel did absolutely nothing. Can you tell me who the witnesses were? The witnesses were Rufus Hernandez- I mean, Your Honor, I don't remember a whole list, but Rufus Hernandez, and I believe the police detectives. I think that- I can't remember if blood spatter was introduced. How did they get introduced? Your client had two prior violent assaults. How were those introduced? The victims of those assaults testified. Okay, so they were testified. And the reporter testified too, right? No, the reporter did not testify. Rufus Hernandez testified. And then the defense presented its mitigating case based about the social history and Sanchez's wretched childhood and adolescence. Okay, the jury did not hear the reporter's evidence at the penalty phase? No. With regard to the penalty phase, it's been quite a bit of further questions on the guilt phase and effective assistance of counsel. The special circumstance that survived was regarding the Boca Negra, and that was the multiple murders, right? Because the court did not find the specials on- that the murder was committed in a robbery, or that- okay. So, actually, Mr.- is it Toton, or whatever? How do you say his name? Toton? Counsel Toton. Yeah, so he actually got some of the specials stricken at the guilt phase, right? He did, but it was because the prosecution's very weak. Hernandez, the key witness, said, yeah, they went to rob, and yeah, they went to borrow. And then the evidence showed that- Well, I guess that's your explanation, but it's like, since you're portraying him as a potted plant, essentially, that, I mean, the other side's going to say that he cross-examined witnesses and that he got some of the specials knocked out, right? So, I just- I just want to, like, put that in perspective. But I think the question is not- yes, he did some things. The question, really, on ineffective assistance is, what didn't he do? And he didn't present the defense that he himself said he would have liked to present. He didn't use Ray of his admissions to counter- to counter with Mr. Hernandez. He didn't cross-examine the statement. He didn't hire a criminalist and challenge the prosecution's basic two-person theory by having a criminalist say there were three sets of children. He didn't investigate and teach for Mr. Hernandez, and he did no investigation of Sanchez's mental state. So, I think the question is, we have to look at what he didn't do in assessing whether he was effective. And at the penalty phase, it's clear that- I have to look at what someone didn't do. I also have to look at what they did do, don't I? I mean, I can't just look- you know, I guess I'm trying to- I got to look at both sides. You don't have to tell me both sides, but I got to look at both sides because the other side's going to say that. And we have to look at prejudice, too. But what he did is not inconsistent with all the things he could have done. He could have not gotten the celery and roast special, and still has created a reasonable doubt on whether Sanchez intended to kill Juanita or Juanita Bocanegra and aided and abetted Joey. I don't see those as mutually inconsistent. And if we turn to the penalty phase, we see the failure of counsel in a very stark term. There can really be no question at this point that a defendant's mental impairments can be a powerful mitigation, and that defense counsel has a duty to investigate the defendant's mental state if there's evidence to suggest that he may be impaired. It's not surprising in this case that the district court did not deny Claim 48, and the state did not argue for affirmative denial on the grounds that Sanchez failed to allege a primary patient case of deficient performance in state court. As Sanchez alleged, there were numerous red flags to put counsel on notice to investigate his mental state, including a pretrial sanity evaluation by Donaldson, jail medical records that showed he was in a safety cell on pre-intentions and attempted suicide, and the defense's own penalty expert urged counsel to hire a neuropsychologist. So is that right that you're talking about? Yes, it's about right. Okay. Let me, there were two medical people that did see your client, correct? And that would be Dr. Donaldson, which Mr. Toton and Mr., I don't know what the Mr., it's not, okay, I want to say, it's not Grant, it starts with an F, it's Frank. Okay, Mr. Frank. Mr. Frank and Mr. Toton, and then there was a Dr. M with a long name that also, and they said certain things about your client, but they also both said that he's a sociopath. So I guess my point is that there's your, it's a lot of things that you're, there's also damaging information included in all the things that you want them to do, as well as positive information. So we have to look at that in terms of counsel trying to navigate that. I mean, I don't know, at one point your client said he killed how many people? As a gangster? Yeah. He said that was completely unproper and they didn't come in, but I mean, your client, your client was a little bit of a time bomb. He wouldn't, he talked to the press how many times? Five before he stopped? And then the doctors that looked at him said he was a sociopath besides everything else that was wrong. So it wasn't like calling people was that easy. I guess that's what I'm saying. I mean, in terms of a mental health mitigation plan, it's clear that Mr. Sanchez cooperated completely with counsel except for talking to the press and that he cooperated with mental health evaluation. Dr. Donaldson makes one statement at the end of his analysis in which he finds and puts count on notice that there were indications of organic difficulties and he doesn't just say there might be a possibility. He's finding specific things. He, in his supplemental declaration, explains that his evaluation was done without any background information. I mean, his diagnosis of being a sociopath, as Dr. Foster said in his declaration, was unreliable because it was based on none of the information that a psychiatrist needs to make it competent. So either Frank or Toten say that Wright told them to hire someone either in their declaration? In their declaration, they did not. Of course, this was all the burden of Sanchez's person was to see the kind of patient case and present whatever available document there was. There was no opportunity to have a scheme of power and call people to testify and then drew the claim. And then Wright's declaration was, we got her declaration post, it's for the habeas, right? Yes. And then she died before she actually signed a declaration. Is that correct? After she had revised it. But in this case, I think that the idea that the mitigation could have been adverse evidence, that's true in any case. But you have to look at what the single sentence unsupported, unexplained in Donaldson's and Medicare's report. There's no sense that if Foster explained, the diagnosis should have been post-traumatic stress and depression. And so I think that the idea that there could have been a counter... Well, let me say hypothetically, you could have found someone that would say the things that you're talking about and not say that he's a sociopath. I'm just trying to, and you called that person as a witness. Wouldn't the prosecution be able to call his rebuttal to doctors that said he is a sociopath? Well, first they wouldn't have known about Donaldson because the only thing they knew was that he was a sociopath. But I think that the fact that there could be a counter-opinion does not defeat prejudice, given the documented detailed declarations that should have resulted in an issuance of an OSB and then further litigation and a chance to prove this in state court. So I'm going to ask Judge Goldson-Dulgence that there's something I don't want you to stress over that. You'll give her five minutes after I finish. Yes, I will. Thank you. So I don't want you to stress over that. Okay. I know that there's a Chiu petition here and I couldn't find anything. Is it second superior court or what is the status of that? So the status of the Chiu petition is like a lot of the petitions now in the superior court under Prop 66. It's the same state and in the California Supreme Court's decision and a case called Friends, which is going to decide some of the big challenges to Prop 66. So technically, just, I'm just trying to sort of, all right, so technically the fact that the two specials were not included in the Chiu petition. Isn't that helpful? I actually can't fly. It seems that it would be because the whole point of Chiu is that it, while it doesn't necessarily get rid of felony murder, but it does get to where the foreseeable argument is made and that people... Felony murder has no relationship to Chiu. Well, but he could. Okay. But technically I'm just, if let's say his Chiu petitions were granted on both of these murders, then that would be complete relief, right? Because it wouldn't that be? It would be if it's a complete grant of a new trial. Yeah. I mean, Chiu basically says that's an insufficient basis for first degree murder, right? It is. And then it would be reduced. In this case, we have the multiple murders special. And if it's reduced, then you're not, you're not looking at the death penalty. So that's absolutely correct. I mean, I know you don't have to tell me every avenue of it, but I mean, that is a significant... That is absolutely right. That is the answer. I know I've asked you a lot of questions. Okay. So I'm going to reserve that for you. Thank you. Thank you. Okay. For appellees, we have Ms. Shattinger. Is it appellees? We're ready. Yes, Your Honor. Good morning. My name is Jamie Shattinger, Deputy Attorney General for the appellee. Can you just talk a lot flatter too? There's something about this. So use your outside voice. Yes, Your Honor. Is that better? It is. Thank you. From the beginning of this case, counsel was focused on the end. They tried to build a coherent, reasonable strategy to try and save Sanchez's life. We're not going to look at individual pieces of evidence. Instead, we have to look at the whole picture, both under 2254 and in light of what counsel could do at the time. This was a time-sensitive case where Sanchez wouldn't stop pleading guilty to the press and Totten was afraid that Reyes would strike a deal with the prosecutor and testify against Sanchez. I'm curious here, though. Counsel for Sanchez says that Reyes's statements could have been admitted at the Sanchez trial. I'm kind of having a hard time with that. Can you address that evidentiary issue? Yes, Your Honor. I am unaware of any hearsay exception that would have allowed Reyes's statement to Feeley to be admitted at Sanchez's trial where Reyes was not a party. The only evidence from Feeley that could have come in that would have been admissible were Sanchez's statement to Feeley, and those were far from a dream for at least five reasons. As we mentioned, Your Honor, Reyes had already invoked his Fifth Amendment right and wasn't going to be testifying. So all that they were left with was Sanchez's statement, which had Sanchez pushing Juanita into a back room, tying her up, hitting her with a pipe. And as this court alluded, the evidence could – some fair-minded jurists could find that the evidence showed that Sanchez pushed Juanita into the back bedroom to – like a kidnapping – to prevent her from helping Juan and to put her alone so that she would be a better victim. They would have also heard Sanchez's statement to Feeley that they laughed after the murders because it was no big deal. And that really went against all of the defense's theme, which was to appeal to the jury for a plea of mercy and an a-lot sentence. You can't really do that with inconsistent themes and different theories of what happened. Feeley was also a hard witness for Totten because he knew that the DA wouldn't call Feeley. Now, Sanchez likes to say that that's because the evidence would have been so good. But really what it means is Totten didn't trust Feeley. He declared that he had had her previous experience with him, and he didn't think that Sanchez had spoken to him. Ms. Scheidegger, may I interrupt you for a second? Yes, Your Honor. Please explain to me – let me find out one thing if we're on the same factual basis. Two weeks before the trial, Totten had a tape-recorded statement from Feeley, correct? Yes, Your Honor. In that statement, Feeley exonerated Sanchez from hitting Juanita – pardon me, Juan – over the head with a bar. He said Reyes did that, right? That's correct. Why – what possible reason is there for Totten not to have called Feeley to the stand? There were a few reasons. Feeley's statement – are you done with your question, Your Honor? Go ahead. What two reasons? Feeley's statements were inconsistent with the evidence at the crime scene. So, for example, the blood evidence showed that the attack on Juan started in the hallway, not in the kitchen. And according to Feeley's version of the event, Reyes and Joey attacked Juan in the kitchen. So, Feeley's statement would have been subject to impeachment from physical evidence. Also, Feeley's statement still inculcated Sanchez in Juan's murder by – he was in the front room of the house while Reyes and Joey were stabbing Juan in the kitchen. Then he pushed Juanita out of the way as she comes screaming in to try and help her husband. He binds her in the back bedroom and starts hitting her with a pipe. So, those are two very important reasons why Totten would have elected not to call Feeley as a witness to give the damaging statements that Sanchez admitted. And, of course, you'd still also get other inculcating statements about laughing after the murder without any of the Reyes portions of the admissions to Feeley. So, what about – what did Sanchez – what was the testimony that Sanchez said to the police about? What had happened? How did that correlate to what Feeley said Sanchez told them? How did those jive? Well, Sanchez said lots of different statements to lots of different people. To the police, he said to Stratton that he gave hypos. What if I was in the house? What if I saw Joey stabbing his father? And those statements then put him in the room and put him knowing what happened. As the prosecutor explained in closing, that showed his mental intent of intent to kill. Even Sanchez's own statements to police hurt him. And then, of course, we had the repeated admissions to the press where he said he's a triple killer, where the murders were brutal, and perhaps most importantly, he described how the murders happened. So, once again, he put himself in the house during the time of the murders. How did the statements about the murders to the press – how did those correlate to what he said to Feeley? Feeley's statements were inconsistent with what he said to the press. What Sanchez said is to Feeley. To Feeley, Sanchez told Feeley that it was Reyes and Joey who attacked Juan. But Sanchez told the press, Trihe, and published reports that he attacked Juan, that they were three brutal murders, Chapman, Juan, and Juanita. So, Feeley's evidence would have already been rebutted by the physical evidence, including Sanchez's footprint, bloody footprint found in the kitchen, and the location of where the attack began, and his own statements to Trihe and Brown, plus Hernandez and Stratton. So, it's fairly unsatisfactory to hear that Joey Bocanegra was completely dismissed, and I don't know if on Father's Day and Mother's Day he laments that he's an orphan, but under all of these statements, it certainly seems that he had something to do with it. Why did he escape? Yes, John, I agree. And actually, I think the part about Joey is important because it explains why Reyes's testimony or admission to Feeley would not have been admissible. The problem the state has with Joey's prosecution is that they only have statements by co-conspirators. Those are inadmissible. So, Joey's fingerprint being in his parents' house didn't have much evidentiary value, and they only had Reyes and Sanchez talking about Joey's involvement. In the same way they couldn't make a case against Joey, Reyes's statements couldn't have been introduced from Feeley, could not have been introduced at Sanchez's trial. Did he ever get an offer of ELWOC, or is my understanding that he didn't, on the time he was supposed to cooperate, he wouldn't or something? He was trying to, get a… I would say to that, but Joey helped himself. He didn't talk to the police, and he didn't enter a plea. What Reyes declared was, after the guilt-based evidence, Totten told her that Sanchez would give him information on Joey, and that really would have been Sanchez's opportunity to help himself, to go with the defense theory of, let's try to seek mercy in an ELWOC sentence by helping the prosecutor. But Sanchez refused, not Totten. Totten was the one who set it up to try and help his client. Sanchez refused to help himself by telling on Joey, despite the fact that he had already been convicted of capital murder, of first-degree murder. What, and Joey's wife gave him an alibi? Yes, Your Honor. Do you know anything about the, the two proceedings? I know the report. Not much more than Ms. Ripken. I know that there is, that we are, we have stipulated to a stay and hold friends has been decided. It's not clear to me that, that she will be dispositive in this case. What about Bright? What about calling medical, further establishing either his drug usage or, you know, sniffing glue? And I guess he had, didn't he have a, some organic brain damage at 18, something along those lines? What, why didn't anything come in about that? Well, Your Honor, as we've said, counsel was focused on the end, and that was seeking mercy of an LWAT sentence. So pointing out different parts of things that it could have been was A, inconsistent with that theme, but B, there was no evidence in 1987 of organic brain damage. There was evidence from Donaldson's report in 87, and that's Chelyab's report that Sanchez was a sociopath with borderline personality disorder, who was an alcoholic and a drug user, and pretty much a transient in school dropouts. That could have led to some mental health evidence, but that was a pretty risky calculation that this court can't find Sanchez ineffective for failing to do. I also wanted to clarify as to this court's question of who testified at the penalty phase I presume, well, for the prosecution, Boggs testified and the pathologist, Boggs being the officer involved, since the jury that sentenced him to death didn't hear that, didn't hear what, how the murders occurred, how did you, how did you put that into evidence? How did the prosecutor put it into evidence? Yes. They had to do that, excuse me, Your Honor, they had to do that through the law enforcement officers, through his admissions, because Trihe did not testify, they didn't have the evidence from the newspaper article. They just had the article, for example, at the guilt phase to really focus in on what Totten knew, and to that point Totten knew there were major landsmines in a mental health defense where the jury would learn he was a sociopath, even in 1987. To say that eight or seven or eight years later we could have other mental health experts review what they themselves had done prior and find things that could have led to further investigation is not the standard we're looking at in this court. What we're looking at is, did counsel make a reasonable decision to prevent the jury from hearing that he was a sociopath with borderline personality disorder and drug abuse? So tell me again, now just give me the list of witnesses that the prosecution called at the penalty phase, and any for the defense, if any. Yes, Your Honor. Rosanna McGrew, she had to do more with the case of the Tatman murder. Mitchell Willoughby, Randy Boggs, Dr. Holloway, Glenn Rundius, Bob Stratton, Greg Laskowski, Rufus Hernandez, Bob Stratton, Hassan Anmari, Arturo Pena. Those were the prosecution witnesses. And then for the defense, they called Robert Reyes, but he invoked. Christina Reconomy, who was the investigator, the defense investigator, who tried to vouch for Wright's declaration, which was unsigned and therefore of no value. Joey Bocanegra, who also took the fit. And then family members or people who knew and cared about Ponchez, like Stacey Zoller, Barbara Alvarado, Bobby DeArmond, Dr. Wright, and Robin Ponchez, his wife. Did Dr. Wright testify at the penalty phase? Yes, Your Honor. Is that the same Dr. Wright that Yes, Your Honor. She was hired to do a social history and sort of paint Ponchez in a different way. What did they call it? A social historian or anthropologist? Yeah. Anthropologist, social anthropologist or something along those lines. Yes, Your Honor. And she did as good a job as she could at presenting the defense scene in a plea for mercy. That is, he had a terrible childhood. And in fact, even the prosecutor admitted that he had a terrible childhood and was entitled to, you know, sympathy for that, that his mother didn't love him and that he was poor. But notably in the presentation of the penalty phase evidence, they omitted evidence of drug use, alcohol use, because that didn't go toward a defense theme of seeking mercy. So, can you explain the two footprints and three footprints and the significance of that and what your, how your, because that never came out to the, apparently that was argued, right? Yes, but it's wrong. I mean, ultimately that's wrong. So, when did we find out that there were three footprints? We learned that the evidence shows that there were three footprints after Sanchez's trial. Just to clarify, the prosecutor didn't say there were only two. The prosecutor said the evidence showed there were two. And there never was any question that there were two, Sanchez and Joey, in the house. Even Hernandez's statement to Seeley says that. So, what we know is that at the time of trial, Laskowski only saw two shoe prints. And that's what he testified to and what the DA relied on, because that was the state of the evidence. And, of course, they couldn't argue things not supported by the evidence. After trial. If they, but knowing that there's three, actually, how could they have argued differently if they had known there was three? There's no evidence in 1987 that anyone knew there were three shoe prints. It's different to say that they thought there were three people in the house, but to say there are three shoe prints, there's no indication in 1987. There's no expert that Sanchez has found now to say in 1987, I would have been able to tell you there were three shoe prints. So, the only evidence was two shoe prints. That could have been because the prosecutor ever argued that only two people committed the crime. She said there were two people in that house. Not only two people. And that's important because the prosecutor was relying on the evidence available. The evidence showed two footprints. The evidence showed two people. After Sanchez's guilt, or after Sanchez's penalty-based trial, as the DA was preparing to try Reyes, she asked Laskowski to re-examine the evidence. And she corrected Laskowski's declaration to say, I didn't tell him to find me three footprints. Perhaps, during her preparation and trial for Sanchez, she realized there really may be three sets of footprints in the house, and asked Laskowski to re-examine the evidence. And when he did, he found a third shoe print. That's when the third shoe print evidence was found. Judge Gould, if I may interject for just a moment. I thought that the appellant was arguing that the prosecution's case hinged on there only being two footprints. So, that there couldn't be a conviction if there were three. So, what's your view as to whether or not the prosecution case depended on there being only two footprints? The prosecution's case was based in the evidence available, physical evidence, the bloody shoe prints. And Sanchez's statements to the press. And Sanchez's statements to Stratton and Hernandez. That showed that there were two. It didn't show there were only two. And that's, that is the distinction. It is not that the prosecution's case hinged on only two assailants. It is that Sanchez and Joey stabbed Juan and beat him over the head, and then pushed Juanita into a room. Now, it's possible that Reyes also was involved in that, and the evidence tends to show that. But the prosecutor's case did not hinge on only two. It hinged on based on the evidence presented in 1987, there were two shoe prints found. And the third shoe print, frankly, only bolstered the prosecution's case given Sanchez's admission to others. To Hernandez, to Trahi, and to Brown. Well, what, in what way could a third shoe print exonerating? That's an excellent point, your honor. A third shoe print wouldn't have helped Sanchez because by all accounts, Sanchez was in the house with Joey. So a third shoe print would just show that there was a third person in the room with Joey and Sanchez. And that really goes, I think, to an important part of this, that Sanchez, you can't be prejudiced by a third shoe print because he was still in the house. He was still there. It didn't exonerate him. It only inculcated Reyes. And the reason, excuse me, your honor. No, go ahead. And the reason that the third shoe print mattered in the Reyes case is because Reyes had told the prosecutor, or Leslie Reyes's attorney, if you find a third set of shoe prints, I'll plead. So this is how that came about, and that is why Reyes pled. Reyes declared that she thought that Sanchez was more morally culpable in these murders. So they were both equally guilty. So what about, I think that they asked the question about regarding Juanita and the, can the evidence be viewed that Sanchez was trying to restrain Juanita so that Juan could be killed? And I think that Ms. Ripken made, her point was that she said, well, the prosecutor never, you're the first person that's ever said that, Judge Bail. So what about that? Your honor, the evidence, I think, is viewed in a light most favorable to the judgment and under a doubly deferential standard as required under 2254. The evidence clearly shows that that was part of Sanchez's shared intent with Joey to kill his parents, to kill Joey's parents, the Boca Negras. It's not that Sanchez pushed her into a room to keep her quiet, he pushed her away so that she couldn't help her husband. She couldn't continue to scream and perhaps gain assistance from someone else. He pushed her into a room, he bound her hands and feet, and it's interesting, the prosecutor did say at closing that there wasn't evidence that he was trying to strangle her. But if I were trying to quiet someone down, I wouldn't put a cloth around their neck, I would put it around their mouth. Well, was the pathologist's evidence something to the effect that there were marks on the neck? There were marks around the neck showing something like a ligature, but she was not strangled. Ms. Scheider, may I ask a question of you? Witness or other evidence was there that Sanchez's purpose in holding on to Juanita or moving her into another room was for the purpose of restraining her intervention in the murder that was taking place of her husband Juan. Who testified to that? There was not testimony, Your Honor, about his intent in pushing her into the back room. You can just view the facts in a light-mode favorable, and that shows his very intent with Joey in stabbing Juan, preventing his rescue, and in any event pushing Juanita into a back room and hitting her over the head. Let me interrupt you. Well, wasn't there a part of the article that was brought in by Triheat, the reporter, that Sanchez was restraining Juanita from aiding Juan? Yes, Your Honor, that's a great point. He also slipped in Juan's blood. Triheat reported that he slipped in Juan's blood as he tried to jump over and get to Juanita, which is yet another indication that he was trying to get to Juanita to keep her from getting to her husband and seeking to help him. Just so that I understand, and I went over this with counsel for the appellant, Ms. Rootkin, that at this sort of odd combination court trial, slow plea, that type of thing, but it was determined it was not a slow plea because there were actual witnesses that were called into Taunton cross-examined. What was Taunton successful in striking from the information, I guess, or that it would be the complaint or the information, I guess? That's a great question, Your Honor. He was found not guilty of robbery and felony murder to the broken address, so he got a special circumstance knocked off, and that's important because now we only have the multiple murder special circumstance. And he also got the special circumstance stricken on the Tatman murder. Taunton really agonized over the best way to represent Sanchez because, as Taunton explained in open court, this was a catch-22. Sanchez wouldn't stop pleading guilty to the press. He wouldn't help himself by giving information to the DA that would have saved, spared his life, and perhaps more importantly, Taunton was afraid that Reyes would plead on his, or would strike a deal with the prosecutor and testify against Sanchez. So what Taunton was able to do with this is really limit the evidence that was ever due to the preliminary hearing where Taunton believed there was less evidence of guilt on the Boca Negra murders, the ones that he was ultimately sentenced to death for, and, you know, would be pretty much conceding on the Tatman murder, notably not the capital murder in this case. But it was the best thing he could do because Sanchez wanted to plead guilty and Taunton couldn't let him just plead guilty, so in this way he was limiting the evidence available and really limiting what the prosecutor could do. Remind me of why the reporter didn't testify at the penalty phase. Well, the reporter only testified at the guilt phase, you know, to two specific facts. That Sanchez was a triple killer who killed for their social security checks, and Sanchez says that he wasn't cross-examined at all. He was. There just wasn't very much evidence produced from the reporter's evidence that could be used, that needed to be cross-examined. It was print evidence, and had Taunton cross-examined Trahi more, perhaps the prosecutor would have rebutted with, show us how Sanchez showed you how the murders took place. What was the prosecution trying to put in more evidence from Trahi? Did the court limit the evidence? The court limited the evidence, so the articles were only admitted for the fact that they were published. What we get from the articles is more in terms of the IAC claims now, because we understand all that Taunton knew, but before the guilt phase, Trahi testified to only two facts, and Taunton did the best he could to cross-examine Trahi on those two facts, but as Taunton explained in his closing argument, he didn't want to take stabs in the dark as to what Trahi would have said on cross-examination, given that Taunton thought that he would be getting all of Trahi's notes, and once he realized he wasn't going to be getting that, he didn't want to go on a fish expedition. Are you telling me, pardon me, I took a note, you're telling me that the articles were admitted only to prove they were published, and they were not admitted as evidence of what Sanchez said? The articles were admitted at the guilt phase for the fact that they were published. The evidence interviewed... What relevance is it whether they were published or not? They were admitted for the truth of the matter that he said those things, weren't they? That's what I think, right? Yes, you're not right on that. I mean, that doesn't mean just because there's a newspaper article, that doesn't do anything. But you wanted to admit them, I think, for more, because he said more than was just allowed to come in. But the court limited it to a few things that could come in, right? That's correct. All that Trahi testified to were those two facts, but the article... Actually, but we know that Sanchez said more to Trahi than that. That's correct, Your Honor, and that would have informed Taunton's decision in his examination of Trahi, because he knew those articles had lots of other bad things that he would not have wanted to highlight for the guilt phase. Counsel, Judge Gould, if I may interject a question. Is there any clearly established federal law, and by that I mean Supreme Court law, that says that a felony murder could not support a death penalty? Not that I'm aware of, Your Honor. Now, given the fact that the state court knocked out the robbery special circumstance, could felony murder be proven in this case? As an alternate theory, Your Honor? Do you mean at trial? At trial. Could that have been proven? Well, the felony murder... The trial court found that the felony murder special circumstance was not here, because Sanchez didn't form the intent to rob until after the Boca Negras were murdered. Had the trial court found Sanchez guilty of felony murder for the Boca Negras, that could have also been a special circumstance to support the death penalty. Okay, thanks for clarifying that. So, the theory of the conviction is that he just... They went in there to get the social security checks, and at some point they decided it went bad, and they decided to kill them. Not that they were going to kill them as part of them. They were going to rob them. There was conflicting evidence on that, Your Honor, on whether their intent was to rob the Boca Negras when they went, or to borrow money. And that when Juan declined Joey's either request or demand for money, they began fighting. And as Sanchez said to Detective Stratton, Juan hit Joey, and in response, Joey became so angry that he started hitting his father. But there's every indication in the record that they didn't start the robbery until after the Boca Negras were murdered, and they had already started cleaning themselves up. So, the felony murder on the Boca Negras was not a clear case. And I stand over my time. I just want to say, we can't look at the pieces of this. We need to focus on what counsel knew and what counsel could do in 1987. And their best shot was to fight for Sanchez's life to get an LWAT sentence by building reform with the jury to show that he was deserving of mercy. Okay. Are there any further questions for Appelli? I guess so. You're saying it's your position, basically, that there's no evidence that he's factually innocent of any of the murders. So, that was a righteous theory to try to save his life? Sanchez repeatedly admitted that he was guilty. And, in fact, he never wavered on wanting to plead guilty. So, the best the prosecutor could do was build a coherent theme that the jury could trust and build reform. There's no indication, there's no evidence that Sanchez was actually innocent of any of the murders. Sanchez admitted to being a trickle murderer who killed people for their Social Security checks in a brutal manner and explained how the murders occurred. Okay. Thank you. Thank you, yours. Okay. Thank you very much, Appelli. We'll hear from Ms. Rifkind. And, Ms. Lee, the courtroom clock should be set for Ms. Rifkind to give her a full five minutes of rebuttal. Thank you. I have several points I'd like to address. First, that's the admissibility of Reyes's admissions. On our opening brief, page 45, footnote 7, we explain the admissibility and cite two of this court's cases, Luna v. Cambria and Sanders v. Rattel. The state has argued that Reyes's admissions would have been inconsistent with the principal evidence. This is incorrect. The only thing they would have been inconsistent with was Fernandez's testimony. I agree with counsel for the state. We have to look at the whole picture. And in this case, there was a defense and Toton did nothing. Toton was already knew he was going to be disbarred. He had already decided not to contest his disbarment. If he had looked at the physical evidence, not only would it have been inconsistent with the principal evidence, it would have been completely unreasonable. With regard to tribunal counsel, it's absolutely right that the articles were only admitted to prove they were published. And the reason Toton did this is he wanted to appeal the ruling denying him access to the unpublished material. Toton's focus was completely on getting unpublished material. The article explained the triple murder. It wasn't saying he was guilty. It wasn't saying he had hit one or done anything that under the law would make him guilty of first degree murder. With regard to trying to not let the staff take a cross in the dark, that is completely inapplicable in this situation. Toton had the published articles before them. And I would refer the court to our supplementary docket 64 at 10 and 11 where we set out exactly how helpful those statements would have been. The state said something about this being a compromised defense. Well, maybe that's what Toton did. But as with every IAC claim, Strickland is clear. Counsel must do a reasonable investigation before reaching his strategic decisions or make a reasonable decision that such an investigation is unnecessary. And on each of the claims that we raised, Toton did neither. Counsel had mentioned something about looking at the evidence in the light most favorable to the verdict. That is not the standard for an ineffectiveness of counsel claim. The standard is whether there's a reasonable probability that the evidence that wasn't presented would have so changed the picture that the jury might have a more favorable result. And in this case, RAIA submissions would have presented two possible instances. One toward guilt and one toward not guilty. And what we're saying is that there's a reasonable probability that counsel did everything that we allege he did not do in terms of investigating the evidence and presenting the defense, that there's a reasonable probability that he would have acquitted a first-degree murder of Juan and acquitted a first-degree murder of Juanita. With regards to the whole notion that because Sanchez-Aguilar was guilty, that excused Toton's sufficient performance, we address that thoroughly in our brief. The last point I want to make is about the statements about Donaldson and Mavet-Tarriac. Donaldson was a defense expert who the prosecution would not have known about. He had one sentence about associate tax sponsors explained in his declaration why that was unreliable. Mavet-Tarriac said nothing about Sanchez being associate tax. He only said that he had borderline personality disorder. And his assessment, too, was based on no background information. It was a competency assessment. And I would refer the court to Exodus of Record 1073 to 1076 on Mavet-Tarriac's report. In focusing on the whole, the question here is that it accomplishes all, in terms of the penalty statement, it accomplishes always being considered less culpable. And had the test. Sanchez had an apparent index of 1.0. That's twice the threshold. And following in her career up to the point of testing Sanchez, I've tested 650 people who had reason, where there's some kind of cognitive deficit, and she never before had tested somebody that had a 1.0 score. The truth of the matter is that Sanchez's impairments were not minor, and they were not inconsequential. And had the jury been given that information, along with the explanation of his actual role in the crime, that he was an accomplice, and had that been emphasized, that the mental health evidence was not cumulative, there's a reasonable probability that the jury, as a sworn juror, would have thought that death was not the appropriate penalty. The court has no further questions. I have no questions. I want to thank counsel for the excellent argument. And I thank counsel on both sides, both appellant and appellee. This case shall now be submitted. And we thank all of you for hazarding the open air with the virus around, and for helping us out this way. Thank you. Thank you.
judges: Gould, Callahan, Bea